UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

RONALD ORTH, et al.,

        Plaintiffs,

    v.                              Case No. 07-C-149

WISCONSIN STATE EMPLOYEES UNION
COUNCIL 24, et al.

        Defendants.

**MEMORANDUM DECISION AND ORDER**

On March 6, 2007, plaintiffs Ronald and Eufemia Orth moved for a preliminary injunction to preclude the defendant from charging plaintiff Ronald Orth more than 10% of the health insurance premiums for the coverage presently in place and to require the defendant to refund the amounts it has overcharged him since he retired.[1] After a hearing, the motion was denied, largely on the basis that I found little indication of irreparable harm. With the parties' encouragement, however, I ordered an expedited summary judgment briefing schedule, which has now run its course. For the reasons given below, the plaintiff's motion will be granted in substantial part and the defendant's substantially denied.

**I. Background**

The contours of the dispute are set forth in my order denying preliminary relief and have been addressed during the hearing. In short, plaintiff Ronald Orth retired from a job with the

---

[1] I refer herein to Mr. Orth as the plaintiff and the WSEU as the defendant. Though other parties appear in the caption, the dispute is solely between these two parties.

Wisconsin State Employees Union ("WSEU") Council 24, which was the union representing employees of the State of Wisconsin. The WSEU's employees were themselves represented by a union, called the Council Employees Union, or CEU. The CEU and WSEU were governed by a collective bargaining agreement ("CBA"). Since 1973 the CBA had provided that, upon retirement, an employee's unused sick leave would be used to pay insurance premiums: "At the time of retirement, any unused sick leave shall be used to pay Blue Cross-Blue Shield premiums for the employee and spouse and /or dependents." It also provided that "[p]ayment of premiums will be on the same basis as the benefit is currently paid for employees," and 90% of the employees' premiums were paid by the employer.[2]

Between the time that clause was added to the CBA and Orth's retirement in 1998, only two individuals retired from the WSEU. Each retiree had his full premiums paid for out of unused sick leave funds – that is, the WSEU did not cover any portion of the premiums.[3] When Orth retired, the same happened. No one seemed to notice until 2006, when Orth received a letter from the WSEU informing him that his sick leave funds (which had totaled some $42,000) had dried up. If he wished to continue funding his health insurance, he would have to pay the monthly premium of $1109.44 out of pocket. After attempting to work out the dispute with his former employer, Orth brought this lawsuit alleging breach of the CBA, which he believes required the WSEU to pay 90% of his health insurance premiums after he retired.

---

[2]The 1997-1998 CBA is found attached within the first exhibit to plaintiffs' brief. (Docket No. 30.) Article XIV, the section relevant to this case, begins at page 6.

[3]Recall that these were employees of the union itself (presumably a small entity) not the State of Wisconsin. Thus, it is not surprising that only two individuals retired over a relatively long span.

2

**II. Analysis**

Orth proceeds under Section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185, as well as Section 502 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132. The question in this case is whether Orth's sick leave funds were to be the sole source of premium payments, or whether, as Orth believes, the CBA required the WSEU to pay 90% of Orth's health insurance premiums. Orth's argument is elegantly simple. In section (1)(B) of Article XIV, the CBA states:

> At the time of retirement, any unused sick leave shall be used to pay Blue Cross-Blue Shield premiums for the employee and spouse and/or dependents. Payment of premiums will be on the same basis as the benefit is currently paid for employees.

In Section 10(B) of that same article, the CBA explains:

> The health and dental insurance premiums for the employees of the Council shall continue to be shared. The Council will pay 90% of the total premium while the employee pays 10% of the total premium.

Thus, if a retiree's premiums are to be paid on the same basis as an employee's, and if the employee's premiums are 90% covered by the WSEU, then 90% of Orth's premiums should have been paid for by the WSEU since he retired.

The WSEU believes it's not so simple; in fact, it heaps no small amount of scorn on the plaintiff's reading of the CBA. First, it submits that any ERISA claims must be dismissed because the case involves interpretation of the CBA, not anything related to an ERISA "plan." Second, it asserts that the plaintiff's LMRA claim is unripe because the plaintiff never raised a grievance about the matter. According to the WSEU, disputes about such things as sick leave and insurance benefits must first be brought to arbitration before they become the subject of a federal lawsuit. Finally, the

3

WSEU argues that even if this court decides to reach the merits, the CBA is ambiguous and cannot be found to provide the 90% premium benefit the plaintiff now seeks. I will address these arguments below.

**A. LMRA Claim**

**1. Exhaustion**

Section 301 of the LMRA creates a private right of action to enforce collective bargaining agreements. *Bidlack v. Wheelabrator Corp.,* 993 F.2d 603, 604 (7th Cir. 1993). As noted, Orth believes the defendant has breached its collective bargaining agreement by charging his sick leave account for the full amount of his health insurance premiums instead of only the 10% which he believes he owed. The defendant denies this, but it first argues that Orth is precluded from raising the claim in federal court before exhausting any remedies he had available.

"Failure to properly exhaust should lead a federal court to stay its hand until exhaustion can be completed (or the dispute resolved in the process)." *Stevens v. Northwest Indiana Dist. Council, United Broth. of Carpenters,* 20 F.3d 720, 733 (7th Cir. 1994). The question of exhaustion is intertwined with more general principles of representation and standing. Many courts have found that the union has standing to represent the rights of retirees even though the retirees are not, strictly speaking, part of the bargaining unit. *Cleveland Elec. Illuminating Co. v. Utility Workers Union of America,* 440 F.3d 809, 815 (6th Cir. 2006) (noting that many courts "have held that where a union and a company bargain for retirees' benefits and include the benefits in their contract, the union has standing to represent the retirees in any dispute concerning those benefits.") This is because the union has an interest in protecting the rights it bargained for. Thus, depending as always on the language negotiated by the parties, retirees *may* in some cases choose to "exhaust"

4

their remedies by having their former union represent them through the grievance and arbitration process.

The question, though, is whether retirees *must* exhaust grievance procedures before coming to federal court. The answer seems to be "no." As the Eighth Circuit has noted,

> [Cases allowing unions to represent retirees' interests] support only the proposition that a union has standing to assert retirees' rights under a collective bargaining agreement to which it is a party if it chooses and that an employer may not refuse to arbitrate its contractual obligations with the union. *These cases do not establish that a union which does bargain for its retirees becomes their exclusive representative and that the retirees then must proceed through the union*.

*Anderson v. Alpha Portland Industries, Inc.,* 752 F.2d 1293, 1296 (8th Cir. 1985) (en banc) (italics added).

The Seventh Circuit has cited *Anderson* approvingly. *See Roman v. U.S. Postal Service,* 821 F.2d 382, 387 (7th Cir. 1987). And, in *Rossetto v. Pabst Brewing Co., Inc.*, the Seventh Circuit made explicit that the claims of retirees are their own claims, not subject to the grievance process unless the retirees themselves are willing to make the union their agent. "Because District 10 is not the exclusive bargaining representative of the forty-one retirees that make up the class, any claims for benefits here belong to the retirees individually, and the retirees may deal directly with Pabst in pursuing such claims." 128 F.3d 538, 540 (7th Cir. 1997).

The WSEU cites no precedent *requiring* retirees to exhaust grievance procedures, and apart from any contractual exhaustion requirement I conclude that Orth has no duty to exhaust. This is underscored by the CBA itself. The CBA defines a grievance as a "disagreement between an *employee* and an employer," and indeed the grievance procedures set forth therein do not make much sense when the dispute involves *retiree* benefits. (Docket No. 30, Ex. 1 at Article X.) As the court noted in *Anderson,*

5

> the contract language here cannot be read as requiring exhaustion of grievance procedures by retirees. . . . the relevant provisions address only grievances of "employees" and speak only of "employees" initiating the contractual dispute resolution procedures. For much the same reasons as cause us to reject applicability of a presumption in favor of arbitrability, we also "will not engage the unlikely inference that the parties to [this] agreement[ ] intended to require [retirees] to rely on the Union" to handle their grievances.

*Id.* at 1298 (citations omitted). The same holds true here. As I find no requirement that retirees must first exhaust grievance procedures before coming to court, I conclude that the merits of the matter are properly before me.

**2. The Contract**

The central question posed in this case is whether the CBA language requires the employer to pay 90% of the retirees' insurance premiums or whether the retirees are wholly responsible for such premiums. Once again, the clause at issue states that "Payment of premiums will be on the same basis as the benefit is currently paid for employees." It is undisputed that the CBA provides that the WSEU covers 90% of employees' premiums.

The Seventh Circuit has set forth rules governing the interpretation of collective bargaining agreements:

> We will enforce the terms of a collective bargaining agreement if those terms are unambiguous. *See Young v. N. Drury Lane Prods.,* 80 F.3d 203, 205 (7th Cir.1996). The CBA is unambiguous if it "is susceptible to only one reasonable interpretation." *Moriarty v. Svec,* 164 F.3d 323, 330 (7th Cir.1998). Furthermore, if we find no ambiguity in the terms of the CBA, then, in determining its meaning as a matter of law, we need not review extrinsic evidence suggesting how those terms should be interpreted.

*Mazzei v. Rock N Around Trucking, Inc.,* 246 F.3d 956, 960 (7th Cir. 2001).

The WSEU attempts to show that the CBA is ambiguous, which would allow it to resort to extrinsic evidence, such as how the parties negotiated the agreements and what certain individuals thought the terms meant at the time. The plaintiff, as noted, argues that the 90% employer

6

contribution could not be any clearer and that the subjective intent of any negotiators, or any other extrinsic evidence, is irrelevant.

**3. Patent Ambiguity**

A patent ambiguity is one which appears on the face of the document, that is, it "is apparent just from reading the contract without having to know anything about how it interacts with the world." *Rossetto v. Pabst Brewing Co., Inc.,* 217 F.3d 539, 543 (7th Cir. 2000). In other words, any reasonable reader of the document would conclude that the term in question is ambiguous. The defendant first claims the language is ambiguous because Section (1)(B) refers to another provision in the agreement (Section (10)(B)) rather than explicitly setting forth the amount of premiums that will be paid for retirees. That is, by stating that "Payment of premiums will be on the same basis as the benefit is currently paid for employees," the CBA requires the reader to look elsewhere in the contract to figure out how the premiums are paid for employees. This renders the provision of premium payments ambiguous, in the defendant's view. To be *un*ambiguous the agreement must have read something like "the employer agrees to pay 90% of the retiree's premiums" instead of requiring the reader to look at a different section to calculate on what basis the premiums were paid for employees.

This argument is a non-starter. Under the defendant's expansive view of ambiguity, many federal statutes would be rendered ambiguous simply because they refer to other subsections of the same statute. In fact, Section 301 itself would be ambiguous because it uses the phrase "as defined in this chapter" instead of explicitly reiterating the pertinent definition. 29 U.S.C. § 185(a). In short, requiring the reader to refer to another section of the contract, or to turn the page, does not render a contract provision ambiguous.

7

The defendant also suggests patent ambiguity because the clause refers to both benefits and premiums: "Payment of *premiums* will be on the same basis as the *benefit* is currently paid for employees." In the defendant's reading, this means only that retirees will receive the same level of *benefits* as active employees – not that they will have their premiums paid at the same level. But this reading ignores the clear purpose of the clause, which is to set forth how premiums are to be paid. The entire paragraph reads:

> At the time of retirement, any unused sick leave shall be used to pay Blue Cross-Blue Shield premiums for the employee and spouse and/or dependents. Payment of premiums will be on the same basis as the benefit is currently paid for employees.

The paragraph does not describe benefits at all. Instead, it simply describes how sick leave will be used and confirms that retirees' premiums will be paid on the same basis as employees'. The fact that the sentence uses the term "benefit" is not surprising – the employer's 90% contribution to the premium payments is certainly a benefit (indeed, the key benefit) it is providing. Accordingly, I find that the clause "is susceptible to only one reasonable interpretation," *Moriarty v. Svec,* 164 F.3d 323, 330 (7th Cir.1998), and that no patent ambiguity exists.

**4. Latent Ambiguity**

Defendant also claims a latent ambiguity exists, which if true would justify resort to extrinsic evidence even if the contract appears clear on its face.

> A latent ambiguity is "[a]n ambiguity that does not readily appear in the language of a document, but instead arises from a collateral matter when the document's terms are applied or executed." Black's Law Dictionary 88 (8th ed. 2004). A classic example of latent ambiguity is the tale of the Peerless. A contract to buy cotton scheduled to arrive from Bombay, India, on the ship Peerless appeared plain on its face. Objective evidence revealed, however, that there were actually two ships by the same name. Thus, it became unclear which ship the goods would be on and extrinsic evidence was appropriate to aid in the resolution of the ambiguity. *Raffles v.*

8

> *Wichelhaus,* 2 H. & C. 906, 159 Eng. Rep. 375 (Ex. 1864). If a contract lacks latent
> ambiguity, however, "[e]xtrinsic evidence should not be used to add terms to a
> contract that is plausibly complete without them." *Bidlack,* 993 F.2d at 608 (citing
> *Calder v. Camp Grove State Bank,* 892 F.2d 629, 632 (7th Cir.1990)).

*Cherry v. Auburn Gear, Inc.,* 441 F.3d 476, 484 (7th Cir. 2006).

The WSEU attempts to demonstrate a latent ambiguity by showing that no one ever intended that it would fund 90% of retirees' premiums. Instead, the CBA was implicitly meant to reflect the CBA entered into between the WSEU and the State of Wisconsin, which required retirees to pay 100% of their premiums. As evidence for this proposition, the defendant refers to negotiations over the 1997 CBA, in which the employees sought premium payment scheme for retirees that would effectively require the employer to pay *less* than 90% of retirees' premiums. If the parties believed that previous CBAs already required the employer to pay 90% of retiree premiums, the defendant maintains, this would not have been a sensible negotiating strategy to pursue. In addition, in 2000 the employees made a similar proposal that the WSEU rejected. Instead, the parties agreed that the WSEU would pay the *entire* health insurance premium for a single retiree but the retiree must pay for the difference between the single coverage rate and the family rate. Again, this result would have been a step backwards for retirees if they had already been receiving 90% of *both* individual and family premiums paid for by the employer.

For the moment I will accept the conclusions the WSEU draws from this extrinsic evidence, namely, that the positions taken by the parties to the 1997 and 2000 CBA negotiations suggest either that the retirees did not then have 90% of their premiums paid for or that the negotiators were unaware that the earlier CBAs contained that requirement. Even so, for the reasons set forth below, this is still not the sort of evidence that creates any *ambiguity* in the CBA. That is, the evidence

9

does not reveal that any contractual *terms* are ambiguous – it simply demonstrates either that the WSEU was already violating those terms or that certain individuals ignored those terms.

The Seventh Circuit has explained that there are essentially two uses for extrinsic evidence in the latent ambiguity context: "Although extrinsic evidence is admissible to show that a written contract which looks clear is actually ambiguous, perhaps because the parties were using words in a special sense, there must be either contractual language on which to hang the label of ambiguous or some yawning void, as in the Duff-Gordon case, that cries out for an implied term." *Bidlack,* 993 F.3d at 608. In the "yawning void" context, extrinsic evidence may be used to infer a term when the contract is silent on an issue. For example, in *Rossetto v. Pabst Brewing Co.* the Seventh Circuit referred to a different union's CBA to find that silence in the CBA under review was not dispositive of the issue of vesting. 217 F.3d at 546. This "yawning void" scenario is not at issue here, however, because the CBA explicitly speaks to the issue of retiree health premiums.

The other use for extrinsic evidence is to show that the parties were giving a special meaning to a term that otherwise appears clear. For example, in the most-cited instance, extrinsic evidence could be admitted to show that the name of a ship called "Peerless" (an ostensibly clear term) was actually ambiguous because there were *two* ships of that same name. The fact that there were two ships of that name does not appear anywhere in the contract itself, requiring resort to facts outside of the contract to bring to light the latent ambiguity in the term "Peerless." The WSEU attempts to use the extrinsic evidence described above to show that it was using contractual language in a "special sense," but its argument is ultimately misplaced. The language at issue here states that "[p]ayment of premiums will be on the same basis as the benefit is currently paid for employees." Thus, the WSEU must provide evidence that some or all of these terms are ambiguous because they

10

were being used in some special way not evident from the language itself. But instead of trying to show that any of these terms had a special, hidden meaning, the defendant's extrinsic evidence is limited to showing that certain individuals were either unaware of the CBA's terms or that they ignored those terms altogether. None of the evidence suggests any *ambiguity* in those terms themselves: as *Bidlack* explained, "there must be . . . contractual language on which to hang the label of ambiguous." *Id.*; *Central States, Southeast and Southwest Areas Pension Fund v. Central Cartage Co.,* 69 F.3d 1312, 1315 (7th Cir. 1995) ("[T]he fact remains that the affidavit does not purport to decode ambiguous language; it expresses an understanding inconsistent with the language.") Simply put, there is no "Peerless" here, no term that is subject to a special meaning made clear only by reference to extrinsic evidence. Evidence demonstrating that the parties to an agreement either ignored a contractual provision or did not know of its existence does not mean that the parties used that provision in any "special sense" – in fact, it says *nothing* about what the parties thought the provision meant in the first place.

In sum, the WSEU's latent ambiguity argument fails for the simple reason that it cannot show that any particular contract term was ambiguous.[4] Evidence suggesting that certain parties ignored or violated an otherwise clear contract term might show that the parties later *modified* the term in question (as discussed below), but does not speak to any ambiguity in the original agreement itself. *See Trustees of Colorado Til, Marble & Terrazzo Workers Pension Fund v. Wilkinson & Co., Inc.,* 1998 WL 43172, *4 (10th Cir. 1998) ("Though Wilkinson's evidence cannot show ambiguity

---

[4]This is, after all, not surprising. To argue that the relevant terms had some "special" meaning, the WSEU would have to assert that the phrase "[p]ayment of premiums will be on the same basis as the benefit is currently paid for employees" actually meant that payment of premiums will *not* be on the same basis as employees.

11

in the scope of work covered by the Local 77 CBA, it may show that the written agreement was modified through course of dealing.") Accordingly, I conclude that the clauses are neither patently nor latently ambiguous.

**5. Modification**

Finally, the defendant argues that even if the original CBAs provided for 90% employer-paid premiums, the parties modified that agreement through their subsequent behavior and practices. As noted earlier, negotiations in 1997 and 2000 demonstrated that the WSEU employees' union may have been proposing to accept *less* than the value of a 90% employer-paid premium, which in the defendant's view is a nonsensical negotiation strategy. This course of negotiations demonstrates, the WSEU believes, that the parties were at least tacitly conceding that the employer was no longer under any obligation to fund retiree premiums. In addition, the WSEU notes that the two employees who retired before Orth received no contributions from the employer. Both the CBA negotiations and the WSEU's consistent practice of paying no portion of retirees' premiums shows that even if the CBA did originally provide an employer-paid premium, the parties later tacitly modified that arrangement through their behavior and course of dealing.

It is true that "the parties to a CBA may tacitly acquiesce to an amendment of the agreement through their course of dealing." *Matuszak v. Torrington Co.,* 927 F.2d 320, 324 (7th Cir. 1991). But because an amendment produces new rights and obligations, the modification of a contract must contain all the elements of an original contract, such as mutual assent of the parties. *Dallas Aerospace, Inc. v. CIS Air Corp.,* 352 F.3d 775, 783 (2d. Cir. 2003). It is thus doubtful that a course of dealing theory could serve to amend an agreement when the retirees, whose interests were sacrificed through the purported amendment, were not a party to that amendment.

12

Putting that objection aside, however, it is clear that no course of dealing has been established sufficient to modify the clear terms of the CBA. The WSEU emphasizes the fact that two employees retired before Orth, in 1988 and 1992, and neither received any employer contributions to their insurance premiums. This evidence is ultimately unpersuasive. First, it is doubtful that an employer's treatment of only two retirees constitutes a sufficient "course" of dealing that would evidence the mutual assent of the parties to amend their CBA. "[I]n order to rise to the level of a bona fide course of dealing, the unquestioned practice must have persisted over time, such that it would be reasonable for it to be deemed sufficiently established." *International Bro. of Teamsters, Local 371 v. Rock Island Integrated Services,* 2006 WL 1980194, *3 (C.D. Ill. 2006) (citing *Chicago & North Western Transportation Company v. Railway Labor Executives' Assoc.,* 908 F.2d 144, 154 (7th Cir. 1990)). Second, even if the parties did actually intend to tacitly modify retiree benefits, they would be expected to memorialize that amendment in the next CBA they negotiated. Instead, the CBA language remained the same until 2000, when it was amended to require the employer to pay 100% of the retiree's individual premium with the retiree covering the family portion. Thus, the fact that the CBAs continued to provide for retiree premiums throughout this entire period belies the notion that the employer's treatment of two retirees manifested a mutual assent to alter those terms. If anything, it suggests just the opposite.

The defendant also makes much of the CBA negotiations in 1997 and 2000, which it believes demonstrates the parties acted as if the employer had no obligation to pay retiree premiums. But, as discussed above, this evidence merely suggests that the parties to the negotiations were not cognizant of what they had already agreed to earlier. Even accepting the WSEU's argument that these negotiations would make little sense if earlier CBAs had already provided a 90% employer-

13

paid premium, the defendant has not cited any precedent for the proposition that the negotiating positions of the parties can constitute a tacit modification of contractual terms. Indeed, the very purpose of negotiating contracts is to make explicit the terms agreed to, and thus it would make little sense to find that what one party *proposed* during negotiations (rather than agreed to) can somehow trump the plain language of the very contracts that resulted from those negotiations.

Finally, even if these issues were resolved, what the defendant portrays as a clear course of dealing is no more than its own one-sided interpretation of negotiations. According to the employees' union president, for example, no one on the employees' side ever suggested or conceded that the employer was under no obligation to fund retiree premiums. In fact, prior to being contacted by Orth himself, the union believed that the WSEU was actually paying 90% of retiree premiums. (Miller Aff., ¶¶ 4-6.)[5] Moreover, the notion that a generous benefit like this would simply be "tacitly" eliminated at some point is almost preposterous: a health benefit like this is not the sort of item that simply gets hashed out through an informal course of dealing. The WSEU never explains why the benefit, having once been granted, would simply vanish into thin air without so much as a whimper.

In sum, even taking the evidence in the light most favorable to the WSEU, all it shows is that the parties may have been profoundly unclear about what the CBAs required the employer to pay. In fact, this is not a surprising conclusion. Orth was apparently only the third WSEU employee to retire with accrued sick leave. His $42,000 of sick leave was also likely much greater than that of the other retirees, and so other retirees may not have had much expectation of receiving health benefits. (One of the two other retirees explains that he was simply unaware of how much

---

[5] Attached as exhibit 4 to plaintiff's brief. (Docket No. 30.)

14

the WSEU had charged his sick leave account and found other insurance coverage long ago. (Posso Decl., ¶ 5.))[6] The WSEU is a small organization with little experience providing retirement benefits, and thus the issue only emerged from under the radar after Orth, who had no doubt thought he was set for life, found himself with no benefits. Rather than establishing some sort of clear understanding between the employees' union and the WSEU, the evidence only shows that the parties were not fully cognizant of what the CBA actually provided. Accordingly, I find no evidence that the parties tacitly agreed to modify the obligations due under the CBA. Because the CBA clearly requires the employer to cover 90% of a retiree's health insurance premiums, plaintiff is entitled to summary judgment.

**B. ERISA Claims**

**1. Applicability of ERISA § 502**

At the outset, the defendant believes the plaintiff's ERISA claims must be dismissed because they state no claim under ERISA and do not involve any ERISA "plan." Instead, the claims merely involve interpretation of a collective bargaining agreement and the question of who should have been paying Orth's premiums since he retired. Orth believes he states a valid claim under § 502(a)(1)(B) to recover benefits due under the plan and to enforce his plan rights.

ERISA § 502(a)(1)(B) provides that "[a] civil action may be brought (1) by a participant or beneficiary . . . to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). Each of these delineated rights requires that the right owe its genesis to "the terms of the plan." *Id.* That is, by the statute's plain terms, a person seeking to proceed under

---

[6]Attached as exhibit 2 to plaintiff's brief.

15

§ 502 must be seeking benefits or rights that are provided by the plan itself. Here, the dispute is over payment of premiums, and the font of the plaintiff's argument is that the CBA clause governing the payment of premiums and has been breached by the defendant. Because the CBA – not any "plan" – is the only source of rights the plaintiff is now asserting, the defendant argues relief under ERISA is not available.

But the plaintiff argues that the relevant provision of the CBA is *itself* part of the "plan" which gives rise to these rights. *See, e.g., Armistead v. Vernitron Corp.* 944 F.2d 1287, 1298 (6th Cir. 1991) (finding that a "medical insurance plan agreed to in the CBA is a welfare benefits plan under ERISA.") Thus, the plaintiff argues that he is asserting the right to the "benefit," found in the CBA, of having his former employer cover 90% of his health insurance premiums.

An ERISA "plan" is not an entity or a piece of paper, but a more inchoate group of rights, benefits and procedures (literally, a "plan") set up by an employer to create pension or welfare benefits. *See Pegram v. Herdrich,* 530 U.S. 211, 223 (2000) (noting that a plan is merely a "scheme decided upon in advance" for the provision of benefits). The plan may be evidenced by a summary plan description (SPD) and any other documents, such as a CBA, that describe the rights of beneficiaries or such things as how the plan is administered, how premiums are collected, etc. In other words, the fact that the plaintiff's dispute may arise solely from a clause in a collective bargaining agreement does not mean that the dispute does not also implicate the terms of an ERISA plan. In fact, hybrid ERISA / LMRA claims are commonly asserted, even when the dispute is resolved by reference to a CBA rather than merely a plan-specific document.

> The parties agree that the documents relevant to the plaintiffs' [ERISA] claim are the 1998-2001 collective bargaining agreement ("CBA") and the plan description, entitled "Hourly Benefit Plan Information," that RPI distributed in 1998 to UAW

16

and all UAW-represented active and retired employees. The parties further agree that
the terms of insurance, as described in the plan description, were negotiated and
incorporated into the CBA.

*International Union of United Auto., Aerospace and Agricultural Implement Workers of America v. Rockford Powertrain, Inc.*, 350 F.3d 698, 703 (7th Cir. 2003).

Here, the plaintiff is simply arguing that the plan, or scheme, for the collection of his insurance premiums has gone awry, and this involves the WSEU's ERISA plan. "Rules governing collection of premiums, definition of benefits, submission of claims, and resolution of disagreements over entitlement to services are the sorts of provisions that constitute a plan." *Id.* Indeed, the requirement that the employer must pay 90% of the retiree's premium is the central component of the plan. The fact that that obligation is found in the CBA rather than the SPD or Blue Cross contract does not mean that benefit is not part of the plan.

In sum, because the plaintiff is suing to enforce his rights under the plan – in particular, the right to have his employer pay 90% of his premiums – the plaintiff may proceed under ERISA. *See also, Magliulo v. Metropolitan Life Ins. Co.,* 208 F.R.D. 55, 58 (S.D.N.Y. 2002) ("Since this Court finds both that the reduced premium was a benefit under the Plan and that plaintiff has a contractual right under the Plan to a reduced premium, plaintiff may bring an action pursuant to Section 502(a)(1)(B) of ERISA.")[7] And, for the reasons set forth earlier, the CBA clearly provides that the

---

[7] The practical impact of proceeding under ERISA as well as the LMRA is not thoroughly explored in the briefs. The plaintiff appears to have sought ERISA relief in an effort to exclude the defendant's extrinsic evidence, because under 29 U.S.C. § 1102, any modifications to a plan must be in writing. *Coker v. Trans World Airlines,* 165 F.3d 579, 585 (7th Cir. 1999). Because I have found no evidence that the parties did modify any of the benefits due to retirees, resort to ERISA's writing requirement is unnecessary. Attorney's fees, however, may be awarded under ERISA, while they are more difficult to obtain in the LMRA context. *Lowe v. McGraw-Hill Companies, Inc.,* 361 F.3d 335, 339 (7th Cir. 2004).

17

defendant was to have paid 90% of the plaintiff's Blue Cross premiums since his retirement. Accordingly, the plaintiff is entitled to summary judgment on his § 502(a) claim.[8]

**2. ERISA Information Claim**

Plaintiff also brings a claim under § 502(c) for the plan's failure to provide him with documents. 29 U.S.C. § 1132(c). Section 502(c) provides that if a plan fails to provide a claimant with certain requested documentation promptly, then the court may order the plan administrator to pay a claimant up to $110 per violation per day of delay. *Lowe v. McGraw-Hill Companies, Inc.,* 361 F.3d 335, 338 (7th Cir. 2004).

Here, plaintiff asserts that in May 2006, after he was informed that his sick leave account was drying up, he requested a full accounting of how his account had been drawn down since his retirement. He also asserts that he has not received a summary plan description since he retired, and his attorney's inquiries about any changes in premium deductions (which were made in the context of this lawsuit) have not been answered by the defendant.

The defendant raises several arguments in opposition to this claim, not least of which is that it is not the plan administrator on whom § 502(c) places the duty to respond to participant inquiries. It also asserts the plaintiff has failed to exhaust his plan remedies. Moreover, the plaintiff cites no authority for the proposition that ERISA entitles him to an accounting of his unused sick leave. I need not address these objections, however, because I do not find this to be an appropriate case for the award of statutory penalties. *Kamler v. H/N Telecommunication Services, Inc.,* 305 F.3d 672,

---

[8]The defendant named as "The Group Insurance Plan, Wisconsin State Employees Union" does not appear to be a suable entity and is hereby dismissed from the action.

683 (7th Cir. 2002) ("Whether to impose these statutory penalties is within the discretion of the district court and is reviewable only for abuse.") Even accepting Orth's version of events at face value, I am unable to conclude that he was damaged in any way by not receiving an accounting of his sick leave account. Although Orth portrays the defendant as stonewalling and keeping him "in the dark," it has been perfectly clear from the beginning that the WSEU is adamantly opposed to Orth's claim that he was entitled to have 90% of his premiums covered. It is also undisputed that the WSEU has been deducting 100% of his premiums from that account. Thus, Orth was made aware of the critical fact that his account had been exhausted and apprised that the reason for its depletion was his employer's deduction of the full premium for eight years. Thus, it is unclear what goal an "accounting" of his sick leave account would have served.

In sum, this lawsuit is a dispute about benefits, not information. Even if Orth received all the information he sought, this lawsuit would have been the inevitable denouement of an intractable benefits dispute between the parties. He was not kept in the dark about any of the matters relevant to the issue at hand, and he therefore suffered no perceptible injury as a result of any failure to provide information. *Ziaee v. Vest,* 916 F.2d 1204, 1210 (7th Cir. 1990) ("[T]he judge may, but need not, consider the provable injury when exercising that discretion.") Accordingly, I find no reason to award statutory penalties under § 502(c), and the defendant will therefore be granted summary judgment on that claim.

**C. Remedies**

Above I have found the defendant to be in breach of the CBA, which gives rise to liability under the LMRA and ERISA. The parties have not addressed, except in passing, the proper remedy. It seems that the status quo cannot be maintained given that the Blue Cross insurance plan appears

19

headed for extinction. (In fact, the CBA language interpreted here does not guarantee Orth participation in any particular plan – it merely says that his employer will pay a portion of his premiums (although it does identify Blue Cross as the provider)). The existence of possible Medicare benefits also may complicate things. In any event, it seems one proper remedy would be to require the WSEU to credit Orth's sick leave account with an amount equal to the portion of his premiums it should have been paying since Orth retired. The WSEU may also be ordered to deduct from Orth's sick leave balance only 10% of the total premium for whichever insurance plan it ultimately selects, with the WSEU covering the remainder.

As noted, however, these issues have not been sufficiently explored and I am thus reluctant to order a specific remedy without hearing from the parties. Accordingly, the clerk will set the matter for a further hearing so that these issues may be fleshed out.

**III. Conclusion**

As set forth herein, the plaintiff's motion for summary judgment is **GRANTED** in part, such that the defendant is found liable under Section 301 of the LMRA and Section 502 of ERISA. The defendant's motion is **GRANTED** in part as to the ERISA Section 502(c) claim. In all other respects, it is **DENIED**. The clerk is directed to set the case on for a further hearing within the next two weeks.

**SO ORDERED** this   24th   day of May, 2007.

s/ William C. Griesbach
William C. Griesbach
United States District Judge